**SO ORDERED.**

**SIGNED this 28th day of March, 2019.**



_____
Robert E. Nugent
United States Bankruptcy Judge

DESIGNATED FOR ONLINE PUBLICATION

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

IN RE:

**GRAVES FARMS,**

                    **Debtor.**

**Case No. 18-10893**
**Chapter 12**

## <u>MEMORANDUM OPINION</u>

Dean and Michael Graves operate Graves Farms as a Kansas general partnership. They are father and son and equal partners who have contributed capital and labor to the enterprise for several decades. They filed a chapter 12 case on behalf of Graves Farms to restructure their farm's debt and seek to accomplish that by a "partial liquidation" and a "partial lease" of the debtor's assets to Kylee Graves. Ms. Graves is Michael's daughter. The debtor's largest secured creditor is RCB Bank. The Bank has security interests in the debtor's real estate, machinery,

1

and equipment. At the date of the confirmation hearing, January 16, 2019, the Bank claimed a total remaining indebtedness of $1.803 million, including accrued interest and late charges of nearly $342,000. All objections to confirmation of the debtor's plan except those of the Bank are effectively resolved by agreement or can be resolved by making changes to the plan in the confirmation order if the plan is confirmed. As discussed below, the amended plan[1] cannot be confirmed because it fails to meet several requirements of § 1225(a)(4), (a)(5) and (a)(6).[2]

Facts

1. Operations Past and Anticipated

Historically, Dean and Michael Graves have farmed together as partners. Dean, age 81, has retired. The Graves Farms operation included raising livestock and crops. The partnership leased 5,500 acres of land and farmed two tracts it owns, the Poovey land and the Price land, as well as property situated on Dean's homestead. The Graves family has banked with CornerBank, now RCB Bank, for over 35 years. When the Bank urged the Graves' to sell the partnership's assets, they filed this case to preserve them. They intend to allow Kylee Graves, Mike Graves's daughter, to lease or purchase these assets through her operation of the farm. Ms. Graves raised a soybean crop in 2018 on the Poovey land and will commit considerable acreage to growing cotton in 2019. She will cash rent Dean's

---

[1] Doc. 58.
[2] The debtor Graves Farms appeared by its attorney William H. Zimmerman, Jr. Creditor RCB Bank appeared by its attorney Edward J. Nazar. The chapter 12 trustee Carl Davis appeared at the confirmation hearing, as did Kylee Graves, an interested party.

2

homeplace ground and operate the other leased ground that Graves Farms holds. She will also run her personal cattle herd while running the farm. While the partners have discussed possible rents with Ms. Graves, no agreement has been reached.[3] Ms. Graves would take on responsibility for taxes and repairs. Though not clear from the plan itself, the Graves apparently contemplate that, someday, Ms. Graves will own some or all the farm assets. For this matter's purposes, and in the absence of any formal or informal agreements about her role and duties, I find that Ms. Graves's role is more that of a farm manager than a tenant or purchaser. Nothing in the plan indicates that she will assume any liability for the Bank's or any other creditors' claims. She has taken a loan from the Farm Service Agency (FSA) in her name to fund her purchase of some equipment from the partnership— effectively a refinancing of about $318,000 of the Bank's debt. Ms. Graves testified that she intends to conduct the partnership's business as has been done in the past, although she intends to introduce cotton as one of the crops.

Dean Graves (a/k/a Harold Dean Graves) and his wife filed a joint Chapter 12 petition January 17, 2019, the day after the confirmation hearing in this case.[4] That filing stayed a foreclosure sale.

### 2.  Asset Values and RCB Bank's Secured Claim

Graves Farms proposes to repay the RCB Bank's claim by selling some of the Bank's equipment collateral at public auction, by selling some of the equipment

---

[3] Nor has any understanding been reached with the third-party landlords with respect to land that Ms. Graves is proposed to farm.
[4] Case No. 19-10064-REN.

3

collateral to Ms. Graves, and by paying the Bank an amount equal to the value of the equipment it plans to retain over seven years' time.[5] It also proposes that the debtor will retain the Poovey land that is subject to the Bank's first mortgage and pay the Bank its current value over 30 years. The Bank also claims a second mortgage on the "Price" land, but all parties agree that there is no equity in the Price land to support the Bank's lien. The debtor proposes to repay the FSA, the first mortgage holder, pursuant to the present loan contract. The Bank objected to the debtor's proposed values for both the equipment and the land.

### 3. The Equipment

Exhibit A to the plan lists the equipment the debtor intends to auction using Purple Wave, an Internet auction platform.[6] The plan proposes that the net proceeds of that auction be paid to the Bank to reduce its claim.[7] No evidence about the value of this equipment was offered at the confirmation hearing. Exhibit B to the plan lists the equipment that Ms. Graves offered to purchase in her own right with the FSA loan and the values the debtor ascribes to it.[8] Again, there was no evidence or controversy about these values. The Bank and the debtor have apparently agreed on a price for Ms. Graves to pay.[9] The remaining equipment,

---

[5] Trial Ex. 1, Doc. 58, Amended Plan, ¶ 12 at pp. 4-5.

[6] Trial Ex. 1, p. 10.

[7] The Purple Wave auction was to occur in the fall of 2018. When that didn't happen, the Bank sought enforcement of the stay relief order to conduct the sale. At trial, counsel for the Bank advised the proceeds from the auction sale had been applied to the Bank indebtedness. *See* Doc. 27, ¶s 42-43; Doc. 99.

[8] Trial Ex. 1, p. 11.

[9] Doc. 108, pp. 6-7 providing for an agreed upon valuation of $318,725.

4

listed on Exhibit C to the plan, is what the debtor will retain and pay for.[10] The debtor poses a value of $393,000 to be repaid at 5.75 % over seven years in semi-annual payments. The Bank counters that the equipment is worth $411,000.[11]

The debtor didn't offer a valuation witness.[12] The Bank offered the testimony of Lon Sturgeon, an auctioneer and appraiser from Enid, Oklahoma. Mr. Sturgeon testified that he viewed the equipment at various locations in and near Oxford, Kansas, and that he based his values on his recent experience with farm equipment auctions throughout the central Plains states.[13] Mr. Sturgeon testified that the value of the retained equipment as shown on Trial Exhibit 2, is $411,000.[14] Sturgeon noted that to sell that equipment at auction, it would need to be moved and serviced. The cost of doing that would reduce the net auction proceeds as would assessment of the commission of 3.75%. The equipment should be valued considering its proposed or intended disposition or use.[15] As debtor does not intend to liquidate it, a "foreclosure" value is not appropriate. In the absence of any contrary valuation evidence and because the debtor seeks to retain it, meaning that

---

[10] Trial Ex. 1, p. 12.

[11] At the hearing, debtor's counsel submitted a revised plan exhibit C (Trial Ex. 2) that lists an additional implement, a John Deere 640 Header among the implements to be retained. The debtor values this at $50,000; the Bank at $45,000. The other retained items include a 2014 JD 8360 R Tractor, a 2014 JD 1890 Air Seeder, a 2008 JD 1770 16 Row Planter, a 2012 Landoll 7431 Cultivator, a 1994 Fruehauf Trailer, a 1996 Schaben 1000 Gallon Nurse Truck, a 1993 IH 8100 truck and hoist, and a 2007 Peterbuilt tractor. *Cf.* Trial Ex. 1, Ex. C, p. 12 and Trial Ex. 2.

[12] Debtor based its equipment values on internet auction websites and Mike Graves' farming experience.

[13] *See* Trial Ex. BB.

[14] *Id.* items 1, 5, 6, 7, 12, 34, 51, 52, and 57.

[15] See 11 U.S.C. § 506(a)(1).

no liquidation-related expenses would be incurred, I find that the retained equipment is worth $411,000.

### 4. The Poovey Land

The greatest value difference lies in the parties' positions on the value of the Poovey land. This tract of 114 acres (111 acres cultivated) of unimproved dryland is located about two miles north and west of the City of Oxford in Sumner County, Kansas. It has no river or creek access. The debtor valued this land in the plan at $280,000 or $2,523 per acre.[16] The Bank values it at $333,000, or $3,000 per acre. Unlike the dispute about the retained equipment values, this difference is material to the debtor's ability to perform its plan. Each party offered expert appraisal evidence. Both appraisers have extensive land sale and appraisal experience in South Central Kansas and Northern Oklahoma.

The debtor's appraiser, Gene Francis, valued the property at $2,050 per acre or $227,550.[17] He employed a comparative sales analysis that considered three other sales in the area ("comps"). Mr. Francis laid particular emphasis on soil quality in adjusting the three comparative sales' values to the Poovey land.[18] One of his comps, sale no. 2, is located 25-30 miles from the subject, but has a similar soil type. Both Francis and the Bank's witness, Jerry Munson, agreed that in Sumner

---

[16] Trial Ex. 1, p. 7.

[17] 111 acres x $2,050 = $227,550. This value is based upon the number of cultivated acres.

[18] Francis indicated that Class 1 soils are the best quality, followed by Class 2 and Class 3. The higher the class number, the higher the alkalinity of the soil. He stated that the Poovey land was 90% Class 2 soils.

6

County, land that lies west of the Arkansas River and north of the Ninnescah River generally commands higher prices than land south of that area. Both witnesses referred to the area within the confluence of the two rivers as "Paradise Valley." They also mentioned that Sumner County farmers generally believe that the western part of the county receives less rainfall than the eastern part, though neither witness knew of any empirical evidence supporting that. The Poovey land lies just across the Ninnescah about 1 to 1.5 miles from Paradise Valley and is bordered on three sides by gravel roads. Francis's comp no. 2 has only one road-side access and the road is dirt. Both witnesses agreed that passable road access is a strong factor in land prices. If I discount Francis's second comp, I am left with two, ranging from $1,992 per acre to $2,100 per acre. I also note that Mr. Francis and Mr. Munson both used Francis's comp no. 3, a sale in Section 33, Township 3, Range 2 East that yielded $2,230 per acre. Francis adjusted that value for soil content to $2,100.

Jerry Munson's appraisal included six different comps, all within about 10 miles of the subject property.[19] These comps had prices that ranged from $2,100 per acre to $6,000 per acre, a figure later reduced to $3,700. Mr. Munson's approach was to find recent comparative sales with proximity to the Poovey land. Because many of those sales involved tracts consisting of both farmland and pasture, he "extracted" the dryland values which were understandably higher than the average per acre yield of each sale. His high comp no. 2, however, is problematic. Mr.

---

[19] Trial Ex. AA at p. 000155.

Munson initially derived the $6,000 per acre extracted value from an auction sale that yielded an overall value of $4,984 per acre. Mr. Munson testified that when the closing failed, the land was listed for private treaty sale and eventually sold for much less, an average of $3,152 per acre. He insisted that the second sale didn't affect his ultimate value conclusion because the comp 2 property lies in Paradise Valley. Further examination brought out his belief that the extracted value for the farmland in this comp should have been $3,700 per acre. Even so, he stuck by his $3,000 per acre value for the Poovey land, valuing the tract at $333,000.

Munson's comps 2 and 6 include dryland that has riverfront acreage. Munson testified that riparian frontage has recreational value that often outstrips what the land would be worth solely as farm ground. I am inclined to discount comp 2 entirely because of its dissimilarity to the other tracts. Even leaving it in the mix, the median value of the six comparative tracts for dryland is $2,367.50 per acre.[20] This undercuts Munson's ultimate $3,000 per acre conclusion. Based on this record, I doubt that this land is worth $3,000 per acre, but note that the debtor has offered to repay $280,000 or $2,522 per acre, which is more than Francis's value. Just five years ago, the debtor paid $472,000 for this tract. While land values have certainly softened, I doubt that the Poovey land has lost so much of its value. Reviewing the five remaining Munson comps, I am convinced that the land is more likely worth

---

[20] The six comps' dryland prices per acre are, low to high: $2,100, $2,100, $2,230, $2,502, $3,250, and $3,700. I calculate the median to be between $2,230 and $2,505 or $2,367.50. If we drop comp 2, the median value is $2,230.

$2,522 per acre than it is $2,052. I find as a fact that the land contributes $280,000 value to the Bank's allowed secured claim.

5. Cash flow

Graves Farms and the Bank offered competing cash flow projections that are more thoroughly discussed in the analysis below. The Bank's Trial Exhibit DD offers a comparison of what Ms. Graves projects the farm can do versus the Bank's more pessimistic view.[21] Both witnesses appear to have academic and practical expertise, though the Bank's witness, Gregg Conklin, has the benefit of more years' experience in the field. Ms. Graves holds an animal science degree from Oklahoma State University and has farmed in her own right. She runs her own cow-calf operation. She grew up on the farm and has participated in her father's and grandfather's work since she was a teenager. Mr. Conklin holds a degree in agriculture with a concentration in agricultural economics from Kansas State University. He has been involved in agricultural lending for over 30 years and farms in his own right. Both witnesses' testimony was credible and informative.

Ms. Graves's projections rely to a great degree on a successful cotton crop, something Mr. Conklin points out she has never raised. Graves Farms dabbled in cotton years ago but hasn't grown it recently and has no cotton equipment. If Ms.

---

[21] Trial Ex. DD, pp. 174-76 consists of Debtor's cash flow projections (prepared by Ms. Graves) submitted with the amended plan (p. 174), followed by the Bank's adjustment of those projections—lower crop yields and prices (p. 175), and further modification of the debt service for the Bank's market price loan terms resulting in higher debt service (p. 175). Debtor's initial cash flow projections on page 174 are taken from Trial Ex. 6.

9

Graves turns out to be correct, the farm will have an operating margin of $298,268 before debt service on gross farm income of $1.022 million.[22] But if the Bank's prediction proves right, the pre-debt service operating margin could drop to $164,908 and would be insufficient to cover debt service.[23] It is difficult to analyze these comparative cash flows for two reasons. First, the debtor provided no meaningful historical performance information.[24] We know that Graves Farms suffered a recent crop failure that may have triggered its immediate financial distress, but we cannot tell anything about its prior years' performance with cotton or wheat, and only have the 2018 crop performance of milo, corn and single-cropped soybeans.[25] Second, the debtor's cash flow projection incorporates debt service that the plan doesn't contemplate, and the estate shouldn't bear. Specifically, it includes payments for "harvest equipment,"[26] the FSA equipment, and Ms. Graves's home loan totaling some $104,000. None of these appears in the body of the plan nor is any an allowed claim in this case.

In addition, the debtor's cash flows do not anticipate the higher valuation I have found for the retained equipment. If the retained equipment is worth

---

[22] Trial Ex. DD, p. 174.

[23] *Id.* at pp. 175-76.

[24] Trial Ex. 7, Debtor's modified cash flow projections contained actual operating results in 2018, including average crop yields that year, but no prior years' performance was shown.

[25] *Id.* The debtor abandoned the 2018 growing wheat crop to the Bank during the bankruptcy case, leaving the Bank to harvest that crop. *See* Doc. 27, ¶ 38-39. It is unclear from the record the yield, if any, from the 2018 wheat crop.

[26] Trial Ex. 6, p. 5 notes that the harvest equipment debt is for the lease of a combine for Ms. Graves to harvest the crops herself in lieu of incurring higher custom harvesting expense.

$411,000, a seven-year amortization of that at 5.75% amounts to a semi-annual

payment of $36,075 or $72,150 a year, not the $61,000 the debtor projected.[27] The

extra $11,000 of debt service is substantial, making the annual sum of the plan

payments for debt the debtor is liable for about  $109,613 plus a trustee's fee of

$12,179, or an annual total of $121,792.[28] If we credit the debtor's projections, there

is sufficient gross margin to make these payments.[29] But on the Bank's more

pessimistic crop projections, the debtor's gross income would be $888,708 against

expenses of $723,800, leaving a gross margin of $164,908 that would suffice to make

the plan payments and trustee's fee, but not Ms. Graves's independently incurred

obligations.[30]

<u>Analysis</u>

According to the pretrial order filed in this case, the Bank's objections are

that the plan doesn't fulfill the best interest of the creditors test, doesn't comply

with § 1225(a)(5)'s requirements for the treatment of secured claims, and isn't

feasible. We consider these in light of the facts proven at trial. As the Chapter 12

debtor, Graves Farms has the burden of establishing all requirements necessary for

confirmation.[31]

1.  Best interests test failed, § 1225(a)(4):

---

[27] Trial Ex. DD, p. 174.

[28] The correct trustee's fee is 11.111115%, Doc. 72. The trustee's fee on the debt service payments is .11111115 x $109,613 = $12,179.

[29] See Trial Ex. DD, p. 174.

[30] *Id.* at p. 175.

[31] *In re Ames,* 973 F.2d 849, 851 (10th Cir. 1992).

Even at the higher asset values determined in this order, the Bank's claim is woefully undersecured. There is no possible chapter 7 dividend in this case. Not only is the estate's property underwater, but its partners are likely insolvent as well.[32] Even so, because I have concluded that the Bank's equipment lien should be valued at $411,000 rather than the debtor's proposed amount, the plan denies the Bank the value of its collateral, something that it would receive in a chapter 7 liquidation. The plan fails to meet the best interests test.

2. Secured claims treatment insufficient, § 1225(a)(5)(B):

Chapter 12 requires that each secured creditor's claims be paid the value of the creditor's collateral as of the plan's effective date. Absent the creditor's acceptance of the plan, that payment must come either as a stream of payments that has a present value equal to the collateral's value, surrender of the collateral, or its sale. The debtor must provide for the creditor to retain its liens. The Bank challenges the debtor's plan on multiple grounds.

First, the Bank challenges the debtor's proposed collateral values. As discussed above, I have found as a fact that the value of the "Poovey" tract is $280,000 and that the equipment line should be valued at $411,000. The debtor's amended plan proposes to pay $280,000 for the Poovey land, but doesn't provide for repayment of the equipment's value at Class 2(b).

---

[32] As noted previously, Dean Graves has filed his own joint chapter 12 case since this confirmation hearing was held.

12

Next, the Bank challenges the proposed terms of repayment. It urges that the 30-year Class 2(a) treatment of the land debt is too lengthy considering that the debtors borrowed the money to acquire the land in 2013. I note that the original note secured by the Poovey land provided for repayment in four years, to be completed in 2017. That loan has been renewed several additional times. The Bank asserts that the proposed 7-year payout on the equipment is too long. The Bank also questions the interest rate proposed—5.75% per annum. It also alleges that the plan doesn't call for it to retain its liens. The Court notes that on Trial Exhibit DD, the Bank adjusted the amount of its debt service on these two loans to what it contends are market price loans:  5 years at 7.5% on the equipment loan and 30 years at 6.5% on the real estate loan.[33]

While some banks do not extend 30-year real estate loans to farmers, others do. The Bank offered no evidence concerning its usual terms for such loans. Real estate loans secured by farm land are made over long terms. Though farm land values have swooned lately, land of this quality has an intrinsic value. That value may vary over time, but it will never be zero. A thirty-year amortization in these circumstances is not inappropriate.

The equipment, on the other hand, is always depreciating. The most valuable item, the 2014 8360R Tractor, is only four seasons old. In the absence of any

---

[33] Trial Ex. DD, p. 176. The Graves Farms debt service calculated using these modified variables on the equipment valued at $411,000 and the real estate valued at $280,000 would yield annual debt service of $139,012, trustee's fees of $15,446, for a total of $154,458.

evidence concerning rates of usage and depreciation on this and the other, older, implements, a seven-year amortization is not unreasonably long. Though equipment depreciates in value, even old equipment retains intrinsic value if it is operational because there is nearly always a robust market for used farm equipment.

Turning to the debtor's proposed 5.75% interest rate, neither party offered evidence concerning current market rates, its cost of money, or other *Till* risk adjustment factors to the prime rate.[34] But for the filing of this case, the Bank's loans would be accruing interest at 18%, their default rate, a rate that is certainly much higher than the current loan market. My review of the notes shows that the highest contract rate being assessed on one of these notes was 5.25% and the lowest 3.89%. The Poovey purchase money note, Loan no. *9942, only drew interest at 4.96%. That said, I note that the chapter 13 trustee's rate reset at 7% in December of 2018, reflecting a 1.5% risk adjustment to the 5.5% prime rate. In the absence of any rate evidence, I cannot confirm the plan at the debtor's proposed discount rate of 5.75%.

Contrary to the Bank's contention, ¶ 11 of the plan does provide for all secured creditors to retain their liens.[35] Nevertheless, the debtor's proposed

---

[34] The so-called *Till* rate—the prime rate adjusted for risk—is the appropriate discount rate for secured claims in Chapter 13. *See Till v. SCS Credit Corp.,* 541 U.S. 465, 479 (2004). *See also In re Woods,* 465 B.R. 196, 206 (10th Cir. BAP 2012) (noting similarity of Chapter 12 to Chapter 13 and applying the *Till* discount rate in Chapter 12 case), *vacated on other grounds* 743 F.3d 689 (10th Cir. 2014); *In re Torelli,* 338 B.R. 390, 396 (Bankr. E.D. Ark. 2006) (applying *Till's* prime-plus approach for determining the appropriate interest rate).

[35] Trial Ex. 1, p. 4.

14

treatment of the Bank's real estate claim in Class 2(a) and its treatment of the Class 2(b) equipment claims fail to meet the other requirements of § 1225(a)(5). That is a sufficient basis for denying confirmation of this plan.

   3.   Feasibility; lack of historical data: § 1225(a)(6)

The plan must be feasible under § 1225(a)(6). That statute requires that the debtor—the partnership—"will be able to make all payments" and "comply with the plan."[36] "The feasibility process injects an element of pragmatism by 'prohibiting confirmation of overly optimistic plans clearly destined to fail and by not belaboring the inevitable demise of a hopelessly insolvent debtor.'"[37] As the Tenth Circuit has described feasibility in the context of confirming a Chapter 12 plan, it does not require that success be guaranteed; debtors must provide "reasonable assurance that the plan can be effectuated."[38] As written, this plan presents several questions. First, what is the nature of the legal relationship between Kylee Graves and the debtor? Second, are the performance projections the debtor relied on "based upon realistic and objective facts (as opposed to visionary or overly optimistic projections)?"[39]

---

[36] 11 U.S.C. § 1225(a)(6).

[37] Bloomberg Law: Bankruptcy Treatise, Pt. VI, Ch. 212, § III.G.1 (Samir D. Parikh et al., Eds. 2018)(citing *In re Foertsch,* 167 B.R. 555, 565 (Bankr. D. N.D. 1994)).

[38] *In re Ames,* 973 F.2d 849, 851 (quoting *In re Hopwood,* 124 B.R. 82, 86 (E.D. Mo. 1991)). *See also In re Jubilee Farms,* 595 B.R. 546, 550 (Bankr. E.D. Ky. 2018) (noting that reasonable assurance must rise above "bare agronomic feasibility"); *In re Lockard,* 234 B.R. 484,492 (Bankr. W.D. Mo. 1999) (basing feasibility on objective facts, not mere wishful thinking or pipe dreams); *In re Bright Harvesting, Inc.,* No. 15-11178 TR12, 2015 WL 7972717 at *3 (Bankr. D. N.M. Dec. 4, 2015) (noting cash flow projections must be based on valid assumptions)

[39] Bloomberg Law, *supra* at § III.G.2.

Ms. Graves agreed to purchase some equipment from the debtor and she has secured a loan from FSA to do that. The plan provides for that to occur by a private treaty sale under § 363(f) that has yet to be duly noticed to the creditors. While it is possible that the Bank could credit-bid some of its substantial debt at the sale and place Ms. Graves in a contested bidding situation, the pretrial order states that the Bank has agreed to accept $318,725 for the equipment listed on Trial Exhibit 3 and if the Bank concurs, the sale can go forward.[40]

a. <u>Kylee Graves's Relationship to the Debtor</u>

Ms. Graves is described elsewhere in the plan and the pretrial order as "leasing" the farm operation. Not only is there no written lease, there is disagreement among the witnesses about what the terms of the lease might be. Michael Graves, Kylee's father, testified that Kylee would work the farm and pay off the Bank's claims on the Poovey land and equipment. She will be responsible for paying taxes and repairs on the farm. She will pay cash rent to Dean Graves for use of his home place land and be responsible for any farm leases the partnership has taken. Kylee testified that she had not "assumed" the duty to perform Graves Farms's obligations under leases and loan documents. Rather, she said, she'll run the farm as her "own performance." She has borrowed from FSA in her own name to buy some of the equipment and she runs her own cow herd. Presumably, she will pay some cash rent to the partnership for use of its equipment in her own right and for use of its land. The Bank is understandably uncomfortable because it believes

---

[40] *See* Doc. 108, pp. 6-7, § 7.1.

this plan is an effort to substitute Kylee for the debtor as borrower, albeit on a non-recourse basis. Kylee, for her part, has not agreed (nor is she obliged) to take on personal liability for the Bank's claims.

The lack of a written lease or management agreement is troubling, but not grounds by itself to deny confirmation on feasibility grounds. While Kylee is not "under contract" to the debtor or the Bank, she showed a powerful filial attachment to her father and grandfather and a desire to preserve their operation that aligns with her own incentives to succeed. She brings new credit, refinanced equipment, and a cow herd to the operation. She also brings a lifetime of farming experience to go with her agricultural educational background. Nothing in Chapter 12 prevents a farm debtor from engaging or employing someone to operate a family farm.[41] If Kylee's operations yield enough free cash to service the debtor's obligations under the plan, the looseness of her arrangement is of no matter. If she cannot "work" the operation to a level that pays the plan payments, this case will fail. And if she can, the Bank and other creditors will be paid.

b. <u>The Crop Projections</u>

This conclusion shifts our focus to the reasonable likelihood of the plan's success. Courts examine the cash flow projections in light of the debtor's historical

---

[41] There is nothing inherently improper in funding a plan through debtor's lease of property to a third-party lessee, but debtor must show that lessee's operations are producing sufficient cash flow to enable debtor to make the plan payments. *See In re Newton,* 217 B.R. 1002, 1004 (Bankr. S.D. Ohio 1997) (Chapter 13 case).

17

performance and experience as supplemented by current market data.[42] Are the projections offered in support of the plan "realistic and objective" in light of the operation's past historical performance? With the current proposed repayment terms and interest rate, it takes approximately $122,000 annually (including Trustee's fees) to pay the proposed plan payments.[43] Whether a Kylee-run Graves Farms can accomplish this seems to depend entirely on the performance of the anticipated cotton crop. The debtor's pro forma cash flows project a cotton crop that yields 1100 pounds per acre at $0.68 per pound for a gross income of $415,888.[44] This crop alone is projected to contribute over 40% of the farm's gross income per year. The Bank points out several flaws in this projection. First, it notes that Graves Farms hasn't grown cotton for some time and that Ms. Graves never has. The debtor's projected cotton yields lack any objective basis.[45] Second, the Bank downgrades anticipated yields from 1100 pounds per acre to 900 pounds per acre based upon its understanding of historical yields in Sumner County. That reduces gross income by $75,000. That would not only eliminate any anticipated operating

---

[42] *In re Chickosky,* 498 B.R. 4, 15 (Bankr. D. Conn. 2013); *In re Morris,* 590 B.R. 753, 756 (Bankr. N.D. Miss. 2018); *Cluck,* 101 B.R. 691, 694 (Bankr. E.D. Okla. 1989).

[43] If the Bank's proposed market rate adjustments to the amortization of its equipment and real estate loans are used (Trial Ex. DD, p. 176), about $154,400 is required annually to pay the debt service.

[44] Trial Ex. 6. Trial Ex. 7 modified downward this projection to a yield of 1000 pounds per acre at $0.68 per pound, or $378,080. The cotton crop would still contribute more than 36% of the farm's gross income under this modified projection.

[45] *In re Ames,* 973 F.2d at 851 ("A plan's 'income projections must be based on concrete evidence and must not be speculative or conjectural.'"); *In re Lockard,* 234 B.R. 484, 492 (Bankr. W.D. Mo. 1999) (feasibility must be based on objective facts, not mere wishful thinking or pipe dreams).

18

margin but would make debt service under the plan more difficult. Third, Mr. Conklin noted that Graves Farms could not insure the cotton for more than 75% of the Sumner County average yield which is 468 pounds per acre, less than one-half of Ms. Graves' projected yield. Three-quarters of the county average is 351 pounds per acre. Thus, the possibility of crop failure resulting from insured risk makes it less likely that the debtor could meet its obligations. The insurance recovery wouldn't come close to replacing the anticipated crop yield—if the entire crop was insured and failed, the gross cotton income would be $132,706 (556 acres x 351 pounds per acre x $0.68 per pound) instead of the projected $415,888. That swing would leave the debtor unable to pay most of its plan obligations and drown the operation.

Another feasibility concern the Bank raised related to Ms. Graves's estimate of the yield for double-crop soybeans. She anticipated planting 383 acres of beans after the wheat harvest and projects that it will make 35 bushels per acre while Mr. Conklin estimates that yield at something closer to 20 bushels. He noted that his estimate was closer to the county average and that Graves Farms had only one year's history (2018) of double-crop performance to back up the estimate.[46] If he is correct, that is an additional $40,000 hit to the total income debtor projects.

The lack of historical performance evidence is the real problem with feasibility. There is no way to know if the debtor's projections are reasonable. Apart

---

[46] Trial Ex. 7 shows that in 2018, no income was attributed to double-crop soybeans, yet that crop yielded an average of 36 bushels per acre in 2018.

from Trial Exhibit 7 containing the single year 2018 yields for milo, soybeans, and corn, the debtor didn't present any historical performance evidence by which to objectively evaluate its crop projections. If the 2018 figures on Trial Exhibit 7 are confined to Ms. Graves' crop yields, all the crop projections should be supported with Graves Farms' performance of those crops over the past 3-5 years. To the extent there is no historical data from Graves Farms to support the cotton yields, the county average of cotton yields may be used as supplemented or adjusted by any other valid assumptions or objective data. Without that data, the Court is hamstrung from making a pragmatic assessment of this debtor's chances post-confirmation because it cannot vet the projections against prior performance. While a debtor is not required to "guarantee" success at confirmation, it must carry its burden to show that it is more likely than not that it "will be able to make all payments and comply with the plan." Between the varying possible outcomes of the cotton and beans and the commingling of the debtor's obligations with those of Ms. Graves, I cannot conclude that this plan is feasible at this time. The Court doesn't doubt Ms. Graves's sincerity, honesty, ability, and willingness to work hard and undertake this farming endeavor, but those qualities aren't sufficient to make the plan feasible.[47] There needs to be more historical information about prior performance by this debtor.

---

[47] *In re Keith's Tree Farms,* 519 B.R. 628, 637 (Bankr. W.D. Va. 2014) (The test is whether the things that are to be done after confirmation can be done as a practical matter under the facts.); *In re Lockard,* 234 B.R. 484, 492 (accord).

c. Feasibility Conclusion

In short, having weighed the evidence and considered the testimony of Ms. Grave and Mr. Conklin, and giving due weight to Ms. Graves educational background along with Mr. Conklin's experience, I cannot find that the projections are based on reasoned, objective assumptions because of the lack of historical information.

Conclusion

Confirmation is denied for all the reasons set forth above, but the debtor is granted an additional 21 days from the date of this opinion, to submit a second amended plan, with historical performance data, for further consideration by the creditors and the Court.

### # # #