**SO ORDERED.**

**SIGNED this 26th day of July, 2019.**



_____
Robert E. Nugent
United States Bankruptcy Judge
_____

**DESIGNATED FOR ONLINE PUBLICATION**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **IN RE:** | |
| **GRAVES FARMS,** | **Case No. 18-10893** |
| **Debtor** | **Chapter 12** |
| **IN RE:** | |
| **HAROLD DEAN GRAVES**<br>**KAREN LYNN GRAVES** | **Case No. 19-10064**<br>**Chapter 12** |
| **Debtors** | |
| **IN RE:** | |
| **MICHAEL KEITH GRAVES**<br>**RACHELLE RAE GRAVES** | **Case No. 19-10982**<br>**Chapter 12** |
| **Debtors.** | |

**<u>MEMORANDUM OPINION</u>**

1

This is Graves Farms' second attempt to confirm a plan. The initial Graves Farms Chapter 12 plan (the "Partnership Plan") could not be confirmed because that debtor did not present evidence of its previous performance and the proposed plan represented a significant change in the debtor's historical operations by adding a new crop (cotton), a new operator whose position or status with the debtor was unclear (Kylee Graves), and new debt. It was impossible to be "reasonabl[y] assur[ed] that the plan could be effectuated."[1]

Now Graves Farms has filed a second amended plan (the "Joint Plan") that not only addresses its debts, but also those of its individual partners, Harold Dean Graves ("Dean") and Michael Graves ("Mike"), each of whom have filed individual Chapter 12 cases with their spouses.[2] The Joint Plan proposes that Kylee Graves, Mike's daughter, will operate the partnership farming assets, contribute some of her own assets and lines of credit, pay either salary or distributions to Dean and Mike, and, at the end of 2023, make balloon payments that will pay off RCB Bank's allowed secured claims. The partnership debtor proposes to make distributions to its creditors through the Chapter 12 trustee and to pay Dean and Mike enough to service their individual debts.

---

[1] *In re Ames*, 973 F.2d 849, 851 (10th Cir. 1992) (quoting *In re Hopwood*, 124 B.R. 82, 86 (E.D. Mo. 1991) and determining that plan could not be confirmed due to speculative nature of debtors' litigation against their lender to fund the plan).

[2] The Court granted joint administration of the three cases. Doc. 160. Unless otherwise indicated, all docket references are to the docket in the lead case Graves Farms, Case No. 18-10893.

2

There remain too many factual, legal, and practical problems to confirm the Joint Plan. It still doesn't appear that these three debtors can make all of their plan payments. Kylee's legal relationship with the partnership debtor remains unclear.[3] The Joint Plan doesn't recognize the separate nature of the partnership's and the individuals' estates. It provides for paying a non-debtor's debts with estate assets. It completely ignores partnership law concerns. It cannot be confirmed.[4]

Facts

An extensive description of the partnership's assets and operations is found in the prior order denying confirmation of Graves Farms' amended plan.[5] Several additional findings are necessary here. First, on January 14, 2019, the Bank sought and received charging orders in state court that encumber Dean's and Mike's partnership interests in Graves Farms.[6] Dean filed his individual case a few days

---

[3] The Joint Plan describes Kylee as the "principal of the farming operation." Trial Ex. 1, p. 1.

[4] Attorney William H. Zimmerman, Jr. appeared at the confirmation hearing on behalf of Graves Farms. Attorney Martin J. Peck appeared on behalf of debtors Harold Dean Graves and Michael Graves and on behalf of interested party, Kylee Graves. Edward J. Nazar appeared for creditor RCB Bank. Brian Sheern appeared on behalf of the Farm Service Agency and Internal Revenue Service. The Chapter 12 trustee Carl B. Davis appeared personally. Andrew W. Muller appeared telephonically on behalf of creditor Farm Credit Leasing Services Corp.

[5] Doc. 120.

[6] Trial Ex. GG. The Bank obtained a $2.208 million judgment against Dean and Mike and their spouses in November of 2018, based upon their guarantees of the partnership debt. *See* KAN. STAT. ANN. § 56a-504 (2005) (Kansas Revised Uniform Partnership Act (KRUPA) provides a charging order on partner's interest as exclusive remedy by which a judgment creditor of a partner may satisfy a judgment against the partner; the charging order constitutes a lien on the partner's transferable interest that may be foreclosed). Section 56a-502 (2018 Supp.) states that the only transferable interest of a partner is the partner's share of the profits and losses of the partnership and the partner's right to receive distributions.

3

later; Mike did not file until May 29, 2019, *after* counsel drafted the "joint plan" in which he and his wife were included.[7] Before Mike filed, the Bank foreclosed on his partnership interest and purchased his partnership interest at a sheriff's sale that was confirmed in Cowley County District Court on April 1, 2019.[8] The Bank became a "transferee" of Mike's partnership rights under the Kansas Uniform Partnership Act.[9] Transferee status entitles the Bank to claim any of Mike's distribution rights and to seek dissolution and wind up of the partnership.[10] Dean's charging order remains unenforced and his partnership interest unforeclosed due to his intervening bankruptcy filing.

Where the Partnership Plan merely addressed partnership claims, the Joint Plan speaks to those claims as well as claims against the individuals.[11] Kylee Graves began farming the partnership's Poovey ground and Dean's "home place" farm ground in the fall of 2018. Expanding her role, the Joint Plan contemplates that she will now operate the partnership assets with Mike's assistance. To that end, Kylee has (1) acquired farm leases that were formerly the partnership's;[12] (2)

---

[7] The partners' bankruptcy filings are acts of dissociation under KAN. STAT. ANN. § 56a-601(f)(1) (2005).

[8] Trial Ex. II (Order of Sale of Mike's Partner Interest entered January 30, 2019); Trial Ex. JJ (Sheriff's "return" indicating Bank purchased Mike's interest by offset bid of $1,000 on March 1, 2019); Trial Ex. LL (Order confirming sale of Mike's interest).

[9] *See* KAN. STAT. ANN. § 56a-504(b) (2005).

[10] As transferee, the Bank may seek a judicial determination that it is equitable to wind up the partnership business under KAN. STAT. ANN. § 56a-801(f) (2005).

[11] Cf. Doc. 58 (Partnership Plan) with Trial Ex. 1 [Doc. 134] (Joint Plan).

[12] The Joint Plan states that the partnership's farm leases have expired. Trial Ex. 1, p. 2, ¶ A.3.

4

personally borrowed money to buy 86 heifers that she will raise and run in her cow/calf operation for the partnership's benefit;[13] (3) personally borrowed operating money from Community National Bank, a $130,000 line of credit, that she has and will contribute to the debtor operation; (4) personally borrowed $300,000 from Farm Services Administration to acquire some of Graves Farms' machinery and equipment; and (5) agreed to acquire the remainder of the Graves Farms assets that are secured to the Bank before or at the end of the 5-year plan term by borrowing balloon payments in her own right from Community National Bank.

The Joint Plan proposes that Kylee purchase these assets by making a series of payments to the Bank under the plan and pay off the Bank's secured claims by making two balloon payments that are due in 2023. Those payments total more than $500,000 that Kylee would fund with new borrowing. At trial, Kylee said she intended to "take out" the Bank's debt prior to the balloon payment due dates, but her lender Community National Bank wanted her to wait a year or two, before taking on more debt.[14]

The Joint Plan retained the original plan's reliance on growing cotton, but at trial Kylee stated she has changed the cropping plans for the partnership, pivoting from her original proposal to growing more traditional row crops and adding to the

---

[13] The cattle are pastured in Oklahoma and the Kansas Flint Hills.
[14] No loan officer or representative from Community National Bank testified at trial. Debtors presented no evidence that Kylee had a loan commitment from Community National Bank for the balloon payments.

5

size of her calf crop. This change was decided two weeks prior to trial in consultation with the Graves's agronomist witness, Shelly Hubler.

The cropping pivot is Kylee's entirely reasonable reaction to the historically wet and cool conditions experienced in south central Kansas this spring and early summer. Rainfall has exceeded 100-year levels in many places and our usual hot, dry conditions have only recently returned as of mid-summer, 2019. Kylee testified that several of the fields had been waterlogged, significantly delaying planting.[15] On June 24, the date of trial, none of the planned 1,250 acres of beans had been planted. Nor had the 146 acres of milo. Most of the 552 acres of corn have only recently been planted and photographs of those fields show its immaturity.[16] Wheat had yet to be harvested—some 514 acres. The late planting and harvesting call the accuracy of the projected yields into question.

Where the Partnership Plan contained no historical data, the Joint Plan included as exhibits a set of 2019 RCIS insurance documents that contained the Graves's historical production and yields from 2009-2018 for each of the named fields or farm tracts in Sumner and Cowley County.[17] The Bank's trial exhibit summarized this data and suggested ranges of historical production per acre that are similar to the Joint Plan's projections.[18] The Bank's representative employed the "Approved Yield" from the RCIS reports. Kylee presented a summary of the

---

[15] *See* Trial Ex. 4, p. 34 for the 2019 Cropping Plan. Kylee testified to the status of each field and crop on the date of trial.
[16] Trial Ex. MM.
[17] Trial Ex. 13 and 14 (Sumner and Cowley County milo, soybeans, corn, and wheat)
[18] Trial Ex. DD.

6

yields from the RCIS reports for each crop on the various fields over the past 5 years—and contends these more recent figures are the more relevant ones.[19] Kylee also offered evidence of forward contracts for wheat and some of the beans that lock in prices higher than those projected by the Bank and current market for those commodities.[20]

The projections published with the Joint Plan (which included cotton as well as payments on Kylee's own obligations) were very different from those presented at the confirmation hearing.[21] While both sets of projections demonstrate positive cash flow, they are difficult to reconcile. If the Court takes the projections offered at trial at face value, the partnership could have gross income of $969,784 and expenses of $686,948. Including interest payable on funds borrowed by Kylee for operating, cash of $268,836 would be available to pay plan payments.[22] The partnership's projected expenses include $63,730 in loan payments to FSA on Kylee's loans as well as $45,000 for her to purchase cattle.[23] The expense projections also include over

---

[19] Trial Ex. 16
[20] *See* Trial Ex. 8. Kylee locked in the soybean price at $8.17/bu. She had 4,000 bushels of wheat contracted at $5.83/bu and 1,000 bushels of wheat contracted at $6.00/bu. The Bank projected the wheat market price at $4.45.  Trial Ex. CC.
[21] *Cf.* Trial Ex. 1, p. 14 (2019 projections attached to Joint Plan) and Trial Ex. 4 (2019 projections presented at confirmation trial).
[22] Trial Ex. 4, pp. 32-33.
[23] *Id.* at p. 32 ("Cattle payment" and "FSA Equipment & House").

7

$56,000 for "Cash Rent" expense—farm leases that are now in Kylee's name.[24] Other expenses listed appear to relate to only Kylee's cow/calf operation.[25]

The Joint Plan addresses the "sale" of the partnership assets to Kylee (the Poovey ground valued at $280,000 and remaining equipment valued at $411,000), subject to the Bank's liens which Kylee will retire by making payments similar to those contemplated in the first plan, through 2023, culminating in the balloon payments. The Plan also provides for Kylee to acquire the approximate 113-acre tract that is part of Dean's homestead and is referred to as the "Home Place." RCB holds four mortgages with a $288,000 principal balance on this property. The partnership would make payments on the Bank's mortgages through December of 2023, at which time Kylee would pay off the claim on the Home Place.[26] Dean objects to the penalty interest portion of RCB's claim against the 113 acres. Dean will retain and live in his residence, which is situated on a 40-acre tract in the southeast part of his home quarter-section, but which is excluded from the RCB mortgages and only encumbered by a mortgage of Quicken Loans. Under the Joint Plan, Dean will pay the Quicken mortgage directly each month.[27]

---

[24] *Id.* The Court observes that most of the farm ground for growing crops is leased under either cash leases or crop share lease arrangements with third party landlords. This was the case even when the farm leases were held in the partnership's name. *Id.* at p. 34.

[25] *Id.* (Vet expense of $5,000 and Leased Bulls expense of $4,200).

[26] The Joint Plan again states that the "Home Place" will be sold to Kylee and she will pay the Bank's lien amortized over 30 years with annual payments of $25,787 and a balloon payment on December 1, 2023. Trial Ex. 1, p. 8

[27] Trial Ex. 1, p. 10, Class 7.

8

The Joint Plan also provides for payment of the individual debtors' debts. It says that the individuals will pay their respective tax debts "in full and without interest or penalties" over the life of the plan. The IRS filed a tax claim against Dean for $141, 384. Dean concedes that he owes at least $62,711.[28] Dean also owes the Kansas Department of Revenue $10,829. As noted above, Kylee would take over Dean's payments on the Home Place's 113 acres. The IRS filed a tax claim against Mike for $153,584. Mike concedes that he owes $71,605. Mike also owes the KDR $12,997.[29] Both Dean and Mike objected to the IRS claims, asserting that some of the taxes are attributable to capital gains that can be discharged under § 1232. Mike also proposes to pay $6,507 to Deere Credit for a John Deere mower under the plan . The partnership will convey the 135-acre Price tract to Mike in exchange for his assuming the partnership's debt to the Farm Service Agency. Mike would make the annual contractual payments of $12,282 directly to FSA.[30]

The Joint Plan doesn't specify payment amounts for the individuals' tax debts, nor did it include any financial projections for Dean or Mike. At trial, counsel suggested that the creditors and the Court rely on their Schedules I and J for that information. Dean's schedules reflect that he receives $3,750 monthly from pension and social security income.[31] His wife receives $627 from social security. They anticipate their social security payments will increase $59 in 2019. They report

---

[28] See No. 19-10064, Claim 3, Doc. 84.
[29] See No. 19-10982, Claim 1, Doc. 56.
[30] *See* Trial Ex. 1, p. 8. Trial Ex. 4, however, indicates that this FSA land payment will come out of Kylee's farming operations and paid through the Chapter 12 trustee.
[31] Trial Ex. EE

9

expenses of $4,884 (including their house payment), exceeding their income by ($448) per month with the increased social security income. Mike and his wife report income of $5,307 per month, $3,000 of which comes from her employment with the school system.[32] Mike reports wages of $2,500, and shows Kylee as his employer, but not who actually pays them. Mike and wife's income exceeds their expenses by $507 per month. Neither's Schedule I/J addresses the tax debt. Dean and Mike lack sufficient income to pay the tax debts and other claims without receiving distributions or compensation from the partnership.

Contrary to the Joint Plan's provisions, both Kylee and Mike testified that Kylee would not succeed to the partnership assets until she and the partnership have paid the Bank's secured claims in full. Kylee summarized her intentions as wanting to work the farm where she grew up and succeed to its assets by contributing her own cattle and other farm income and investing money she has personally borrowed. She intends to compensate Mike for his labor with wages that he, in turn, would use to pay his tax claim. The Joint Plan and the trial projections refer to an "owners draw" of $30,000 annually *in addition to* the $30,000 payable for Mike's labor.[33] Her projections also reflect that, as part of the partnership's expenses, crop and cattle income will be used to service FSA debt upon which she alone is liable. While Kylee considers Mike's expertise invaluable, she is confident

---

[32] Trial Ex. FF.
[33] Trial Ex. 4, p. 32.

10

she can run the operation herself in a way that supports her and her extended family.

<u>Analysis</u>

After the first confirmation hearing in January, the Court valued the partnership land (the Poovey ground) and retained equipment and concluded that the Partnership Plan as proposed was not feasible. Today, the Court concludes that the Joint Plan is likewise unworkable for factual and legal reasons. It is an incomplete reflection of what the parties propose that cannot be enforced as a contract. It fails to recognize and differentiate between the three estates and their separate debts. Instead, it provides for payment of all three debtors' debts, plus those of Kylee, a non-debtor, from partnership income and assets. It disregards Kansas partnership law by providing for individuals partners to pay their  debts to others prior to or at par with the debts of the partnership. Even if Graves Farms partnership's projected income is reasonably attainable despite late planting and adverse weather conditions, it still proposes payments that the Code does not permit. Because Dean and Mike are unlikely to receive partnership draws or compensation, they cannot fund the proposed treatment of Dean's homestead debt, the Price ground debt, or their income tax liabilities.

### A.  Plan Form Issues

A confirmed chapter 12 plan represents an enforceable contract that recasts and reestablishes pre-petition credit relationships between a debtor and its creditors. Section 1227 states that confirmation of the plan binds every creditor and

11

party in interest, whether or not that party has filed a claim or participated in the case. As such, the plan should contain a clear description of all claims and their treatment. This plan has some gaps that make it difficult for the trustee to administer and the parties to enforce. Even its proponents have taken multiple positions about its meaning and intent.

The Joint Plan proposes a sale of the Partnership's assets to Kylee, but at trial, Kylee and Mike testified that she would not take title until the Bank's secured claims had been paid. The plan therefore does not describe the parties' intent.

A Chapter 12 plan should focus on paying the *debtor's* debts. It must provide for the debtor's future earnings to be submitted to the trustee "as is necessary for the execution of the plan."[34]  The plan may provide for modification of the debtor's creditors' claims as regulated by § 1222(b). "Creditors" are entities holding claims "against the debtor" that arose before the order for relief.[35] Claims that are "unenforceable against the debtor and the property of the debtor" are disallowed.[36] Kylee's creditors are not these debtors' creditors. While nothing in the Bankruptcy Code prevents a non-debtor from paying a debtor's debts in a plan, paying a non-debtor's debts with estate assets and income prejudices the best interests of the creditors who are entitled to receive at least as much as they would in a Chapter 7 liquidation under § 1225(a)(4). Thus, the debts Kylee voluntarily incurred for her

---

[34] *See* 11 U.S.C. § 1222(a)(1).
[35] 11 U.S.C. § 101(1)(A).
[36] 11 U.S.C. § 502(b)(1).

12

benefit or that of the partnership are not claims that can be allowed and should not be treated in the Joint Plan.

The Joint Plan mingles the partnership and the individuals' estates for income and expense purposes, adding some of non-debtor Kylee's debts and assets into the mix. As noted in the previous order denying confirmation, the debtors cannot pay her debts with estate assets over the objection of the creditors.[37] In that order, the Court also noted that Kylee could contract to manage the partnership for compensation and use some of that compensation to service her debts.[38] Kylee's legal status vis-á-vis the partnership is still undefined other than a vague reference to her as the partnership's "principal." While loosely combining these three estates to operate one estate's assets to pay all three estates' claims might make for a reasonable settlement proposal, the Joint Plan doesn't comply with the Bankruptcy Code. That alone is a sufficient basis to deny confirmation.[39]

### B. Partnership Law Issues

Nowhere in the Joint Plan do the proponents address the current status of the partners and the partnership. If the Graves Farms partnership is not in dissolution, it is close. As noted, the Bank already has acquired one partner's 50% transferable interest and has a charging order encumbering the other partner's 50% distribution rights. The success of the individual partners' plans is tied to Dean and Mike receiving compensation and distributions from the partnership that would

---

[37] Doc. 120, p. 10.
[38] *Id.* at p. 17.
[39] 11 U.S.C. § 1225(a)(1).

Case 18-10893   Doc# 172   Filed 07/26/19   Page 13 of 21

allow them to pay claims under their part of the plan. Both bankruptcy and partnership law considerations make that highly unlikely.

### 1. Charging Orders and Transferee Rights

The Bank acquired Mike's transferable interest in the partnership before his chapter 12 case was filed by foreclosing its charging order against Mike's interest.[40] That means the Bank is Mike's "transferee." A transferee is entitled to any distributions of profit that the partner would've received and, if the entity is wound up, to that partner's share of the distributable assets, if any remain after all of the partnership's creditors are paid in full.[41] The transferee can also seek dissolution and windup of the partnership.[42] Thus, in the unlikely event of a profit distribution, the Bank would be entitled to receive Mike's share. Dean filed his bankruptcy case before the Bank could foreclose its charging order against him, but the Bank retains a lien on any distribution he might receive.[43]

---

[40] *City of Arkansas City v. Anderson,* 12 Kan. App. 2d 490, 497, 749 P.2d 505 (1988) (creditor becomes owner of partner's interest in partnership by foreclosing its charging order).

[41] *See* KAN. STAT. ANN. § 56a-502 (2018 Supp.) and § 56a-503(b)(1) and (2) (2005). *See also Gaynes v. Conn,* 185 Kan. 655, 661-63, 347 P.2d 458 (1959) (partnership assets must first be applied to payment of partnership debts; partner's interest is only a share of what remains after partnership debts are paid and all accounts are settled); *First Nat. Bank of Horton v. Schuetz,* 103 Kan. 229, 173 P. 2 28 (1918) (creditor of partner has a right to partner's share of what remains after payment of partnership debts and settlement of partner accounts). Notably, these are the only interests a transferee takes. The Bank may not, for instance, exercise management rights over the partnership or exercise an ownership interest in its separate property. *See* KAN. STAT. ANN. § 56a-503(a)(3) and (d).

[42] KAN. STAT. ANN. § 56a-503(b)(3). *See also* § 56a-801(f).

[43] KAN. STAT. ANN. § 56a-504(b). *See City of Arkansas City v. Anderson,* 242 Kan. 875, 890-91, 752 P.2d 672 (1988) (charging order created lien on partner's distributive share of profits).

14

Any profits the partnership earned during plan administration would be payable to the unsecured creditors as disposable income under § 1225(b), not distributable to Dean and Mike. Nor could Mike or Dean receive compensation for services to the partnership, because partners are "not entitled to remuneration for services performed for the partnership," other than services rendered in winding up the partnership's business.[44]

### 2. Dissociation, Dissolution, and Windup

Dean's and Mike's bankruptcy filings caused them to "dissociate" as partners in an "at will" partnership.[45] While the dissociation of one partner might not necessarily trigger dissolution, the dissociation of both partners probably does.[46] When a partner dissociates, that partner loses the right to manage or control the

---

[44] *See* KAN. STAT. ANN. § 56a-401(h).

[45] § 56a-601(f)(1).

[46] This Court has no power to simply ignore their dissocation and permit them to continue in the partnership in the usual course. *Wilson v. Jenkins,* 2010 WL 3564690 at *8, 237 P.3d 1272 (Table) (Kan. App. Sept. 3, 2010). *See Pemstein v. Pemstein,* No. G030217, 2004 WL 1260034 at *1-*2 (Cal. Ct. App. June 9, 2004) (a partner cannot dissociate from a two-person partnership because one person cannot carry on a partnership; no partnership would be left for the remaining partner; court determined the partnership should be dissolved); *Costa v. Borges,* 145 Idaho 353, 357, 179 P.3d 316, 321 (2008) (applying the Revised Uniform Partnership Act to a two-person joint venture and recognizing in dicta that there can no longer be a partnership if one partner dissociates from a two-person partnership because it takes at least two persons to have a partnership; partnership dissolves when only one partner remains). Kansas law defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit . . . ." KAN. STAT. ANN. § 56a-101(f) (2005). *See also In re Hagerstown Fiber Ltd. Partnership,* 226 B.R. 353, 358 (Bankr. S.D.N.Y. 1998) (A partnership in dissolution cannot reorganize or liquidate under Chapter 11; a dissolved partnership that may continue in business solely to wind up is ineligible for Chapter 11 relief), citing *In re C-TC 9th Ave. Partnership,* 113 F.3d 1304 (2d Cir. 1997).

partnership's business other than to participate in its windup.[47] And the Bank, as transferee of Mike's partner interest, cannot exercise management rights or conduct the business of the partnership either.[48] If we can conclude that Mike's and Dean's dissociations triggered a dissolution, the person winding up the partnership may only preserve the business for a "reasonable time" in order to settle and wind up its business.[49] But for these pending bankruptcies, the Bank as Mike's transferee would have the power to seek judicial dissolution and wind up of the partnership.[50] This leaves the long term viability of the partnership entity in question and nothing in the Joint Plan addresses that concern.

### C. Feasibility

Section 1225(a)(6) requires a finding that the debtor will be able to make all of the payments under the plan. Without receiving income or compensatory distributions from the partnership, neither Dean nor Mike can hope to pay their IRS or KDR debts. These claims must be paid in full during plan administration.[51] Dean owes another $288,000 plus interest to the Bank on the Home Place tract that the partnership through Kylee would pay through administration. He also owes $111,125 to Quicken Loans on his homestead which he proposes to pay directly himself. He reports negative disposable income on Schedule I/J. Mike owes another

---

[47] §§ 56a-603(b)(1) and 56a-803(a).
[48] § 56a-503(a)(3).
[49] § 56a-803(c).
[50] § 56a-801(f) (empowering the transferee of a partner's transferable interest to seek a judicial determination that it is equitable to wind up the partnership).
[51] § 1222(a)(2).

16

$6,507 for the Deere mower and proposes to assume the FSA debt on the Price ground with an annual direct payment of $12,282. Without receiving compensation or distributions from the partnership, neither has sufficient income to meet these obligations. Mike reports $507 monthly disposable income on his Schedule I/J. The distributions and payments defy both partnership and bankruptcy law because, as noted, any disposable income that would otherwise be the source of partner distributions is already obligated to the payment of the unsecured creditors of the partnership, including the Bank's large deficiency claim. Simply put, there will be nothing left after that yearly payment to distribute to Dean or Mike. Even if there were a surplus of funds to make partner distributions, the Bank is entitled to them—as transferee of Mike's distributable interest and as the holder of a charging order lien on Dean's transferable interest. The individuals' plans are unfeasible.

The partnership's feasibility is a closer question. After hearing Kylee testify again, the Court has great confidence in her ability to run this operation.[52] Regrettably, it may be too late for her to save it in its current form. The lateness of the planting is troubling. Also worrisome is the revelation during closing arguments that Kylee has pledged the growing crops to secure operating notes taken in her name. The proceeds of those crops will be payable first to that lender, not to service the partnership's obligations under the plan.

---

[52] The Court doesn't discount her "skill, resourcefulness, spirit, and grit," and can consider the "human factor," but as noted by one bankruptcy court, sincerity, honesty, and willingness are not sufficient to make the plan feasible. *In re Akers,* 594 B.R. 362, 371 (Bankr. W.D. Va. 2019).

17

The partnership didn't disclose the decision not to plant cotton until trial exhibits were exchanged the weekend before trial. Indeed, many of the partnership's projections materially changed. While the debtor's suggested yields fall within historical range, the Court questions whether these yields are achievable in 2019. The Bank's photos portrayed the corn as particularly puny.[53] This crop was to contribute $176,715 in gross income. None of the bean crop had been planted and it was to account for over $300,000 in gross income. Between the Joint Plan's filing and the trial, the debtor increased its corn and bean projected income from around $228,000 to $480,000 in an effort to replace the "lost" cotton revenues of $416,000. Despite Ms. Hubler's agronomic testimony that time remained to germinate the recently planted and unplanted crops, the Court is not convinced of this cropping plan's likelihood of success. The weather is beyond Kylee's control.

There was no evidence suggesting that Kylee would be capable of refinancing the balloon payments by the end of 2023. Without persuasive evidence of ability to pay, courts view balloon payment plans as highly speculative.[54] While courts generally do not require that success be guaranteed, they do seek "reasonable

---

[53] Trial Ex. MM.

[54] *See In re Fuelling,* 601 B.R. 665 (Bankr. N.D. Iowa 2019) (citing *In re Michels, infra); In re Michels,* 301 B.R. 9, 17 (Bankr. N.D. Iowa 2003) (a plan that includes a balloon payment is suspect of confirmation unless there is proof of circumstances "likely to produce a bucket of cash at just the right time to make the payment," quoting 3 Keith M. Lundin, Chapter 13 Bankruptcy § 198.1 (3d ed. 2002); *In re Foertsch,* 167 B.R. 555, 568 (Bankr. D.N.D. 1994) (debtors had no prospects for obtaining commitment of funds to finance the plan's balloon payment at end of 5-year plan).

18

assurance that the plan can be effectuated."[55] That assurance must rise above "bare agronomic feasibility."[56] It must be "probable, not merely possible or hopeful" that debtors can make the payments and perform all of their obligations under the Joint Plan.[57] These debtors did not prove that.

The Joint Plan's structural flaws also affect the Court's feasibility analysis. Folding Kylee's present operation into the Graves Farms mix makes it difficult to parse who is paying for what and with which assets. The Court doesn't doubt her talent or dedication to making this work, but even Kylee testified that she had borrowed as much money as she could. It is hard to see a way for the partnership to stand on its own operations, short of Kylee's cattle income and borrowing. The Court cannot find that the partnership debtor can make all of the payments under the plan.[58]

### D. No Lack of Good Faith

---

[55] *In re Ames,* 973 F.2d 849, 851 (10th Cir. 1992), quoting *In re Hopwood,* 124 B.R. 82, 86 (E.D. Mo. 1991).

[56] *In re Jubilee Farms,* 595 B.R. 546, 550 (Bankr. E. D. Ky. 2018), citing *In re Nauman,* 213 B.R. 355, 358 (9th Cir. BAP 1997) (quoting *In re Crowley,* 85 B.R. 76, 79 (W.D. Wis. 1988)).

[57] *In re Akers,* 594 B.R. 362, 370 (Bankr. W.D. Va. 2019). *See also In re Fuelling,* 601 B.R. 665, 675 (describing feasibility standard for confirming chapter 12 plan as having "a rational likelihood of success.").

[58] The Court notes that it also denied confirmation after the first trial based on the lack of evidence of the *Till* rate of interest. *See* Doc. 120, p. 14. The partnership debtor previously proposed a 5.75% discount factor on RCB's claims to which the Bank objected; the Joint Plan increases the interest rate to 7% to conform to the Trustee's current *Till* rate. *See* Trial Ex. 22. RCB doesn't object to the increased interest factor.

The Court firmly rejects the Bank's allegation that the plan is proposed in other than good faith, a confirmation requirement in § 1225(a)(3). Good faith in this context is objectively tested by applying the eleven *Flygare* factors,[59] weighing each according to the facts and circumstances of a particular case. Here, any questions about good faith raised by the unorthodox form of the plan, the preferential treatment of the individual debtors over the partnership's unsecured creditors, and the administrative difficulties posed to the trustee, are overcome by Kylee's motivation and sincerity. These are evidenced by her taking on significant personal financial risk in an effort to save her family's farm and by her undertaking to "take out" family debt for which she is presently not liable.[60]

Conclusion

The debtors failed to demonstrate that the Joint Plan is feasible and that it meets all the other requirements of § 1225. Confirmation of the Joint Plan must be denied. The partnership has had two opportunities to carry its burden of proving that it has met all confirmation requirements and twice failed. Though the Court is

---

[59] F*lygare v. Boulden,* 709 F.2d 1344, 1347-48 (10th Cir. 1983) (adopting good faith factors in *United States v. Estus,* 695 F.2d 311, 316-17 (8th Cir. 1982), *superseded by statute as stated in In re Cranmer,* 697 F.3d 1314, 1319 n. 5 (10th Cir. 2012) (BAPCPA's amendment in § 1325(b) subsumes some of the "ability to pay" factors and narrows the good faith inquiry); *In re Furman,* No. 17-10790, 2017 WL 6520721 at *3 (Bankr. D. Kan. Dec. 18, 2017) (applying *Flygare* factors in chapter 12); *In re Sorrell,* 286 B.R. 798, 805 (Bankr. D. Utah 2002) (applying *Flygare* factors to chapter 12 good faith inquiry).

[60] The Bank is the "pot calling the kettle black" here. It refused to pay cash rents to Graves Farms' landlords after recovering that debtor's crops under stay relief orders, leaving Kylee to pay them personally, *See* Trial Ex. 5 (cash rent checks totaling $30,000). What may be legal is not always right.

20

saddened to do it, it is bound to apply the law to this record. The partnership's case must be dismissed for failure to confirm a plan under § 1208(c)(1) and (5).[61]

Confirmation of the Joint Plan is denied in Dean's and Mike's cases for all of the reasons discussed in this opinion. They are granted 14 days to amend their plans or convert their cases to proceedings under another chapter. Otherwise, those cases will be dismissed.

### # # #

---

[61] Even in dismissal, Kylee retains a potentially viable operation in her own right. She has cattle, farm leases (with crops growing), and equipment financed by her own credit. While the loss of the family land is consequential, some form of Graves Farms remains.

21